UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DANIEL A. SMITH,                          :        Case No.: 3:09-cv-182
                                          :
     Plaintiff,                          :        Judge Timothy S. Black
                                          :
vs.                                       :
                                          :
SECRETARY OF VETERANS AFFAIRS,  :
                                          :
     Defendant.                          :

## DECISION AND ENTRY GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT(DOC. 15)

This civil case is before the Court on Defendant's Motion for Summary Judgment.

(Doc. 15).  Plaintiff filed a Response to Defendant's Motion (Docs. 16, 17), and

thereafter, Defendant filed a Reply.  (Doc. 18).  The Motion is now ripe for decision.

### I. FACTS

Plaintiff Daniel A. Smith (hereinafter referred to as "Plaintiff") is a male.  Plaintiff

was employed as a nurse manager at the Veterans Affairs Medical Center located in

Dayton, Ohio ("VAMC"), beginning in August 2000 where he was assigned to Unit 4

(Tall Pines) of the VAMC's Community Living Center (hereinafter "Unit 4").  Most of

the residents of Unit 4 were dementia patients.  At all times relevant to this lawsuit,

Connie Shiverdecker ("Shiverdecker") was Plaintiff's first level supervisor, and rating

official.  (Docs. 15-1, 17).

As nurse manager of Unit 4, Plaintiff's duties included, among other duties,

supervising the Unit 4 staff nurses to ensure that the staff nurses properly performed their

duties, that the Unit 4 patients received proper care, and that all of the Unit 4 activities were properly monitored. (Docs. 15-1, 17). According to Plaintiff, his duties also included moving Unit 4 to a different location. (Doc. 17).

According to Defendant, other standards and duties of Plaintiff's position included: evaluating the quality and appropriateness of the healthcare provided by the staff nurses in Unit 4; evaluating the performance of the Unit 4 staff nurses; completing proficiencies in a timely manner; ensuring accountability for professional practice of the staff nurses in Unit 4; participating, as appropriate, in VAMC's performance measurement system; exercising the skills and knowledge necessary to implement and evaluate the standards of care and practice that impact nursing practices in Unit 4; assuring that Unit 4 staff nurses' competencies were communicated to them and assessed to promote a high performing nursing work team; and timely completing the Unit 4 staff nurses' performance appraisals and proficiencies, assuring that performance expectations supportive of the qualification standards for all of the Unit 4 staff nurses were communicated and reflected in their appraisals. (Docs. 15-12, 15-16).

### "Cultural Transformation" Program

The parties agree that Plaintiff's duties also included helping to implement the VAMC's "Cultural Transformation" program in Unit 4, and helping to supervise the renovation of Unit 4 to make it more home-like. The VAMC's "Cultural Transformation" program involved the creation of a home-like setting in the VAMC's units, an increased sensitivity to patient privacy, and an increased sensitivity to the

non-medical needs of the patients. According to Defendant, Plaintiff experienced some difficulty in leading the Unit 4 nursing staff in their efforts to fully implement the "Cultural Transformation" program, and there was a patient privacy incident in Unit 4 involving the changing of a patient's clothing in a non-private setting. (Docs. 15-18, 15-19). According to Plaintiff, he did not have adequate nursing staff to fully succeed at his job. (Doc. 15-18).

Shiverdecker orally counseled Plaintiff regarding these matters, and a VAMC education nurse, Christine Schwartzkopf, was assigned to assist Plaintiff with his efforts to train the Unit 4 staff nurses in implementing the "Cultural Transformation" program. (Doc. 15-19). According to Plaintiff, the education nurse was sent to assist him only because she was already on his Unit when he requested additional nursing staff. (Doc. 15-18).

In October 2007, Shiverdecker, along with Schwartzkopf, met with Plaintiff regarding the importance of the Unit 4 staff nurses fully implementing the VAMC's "Cultural Transformation" and to advise Plaintiff that it was not acceptable for him, as the nurse manager, to allow his staff nurses to simply disregard his directives to implement the program. (Docs. 15-18, 15-19). Plaintiff denies that he allowed his staff nurses to simply disregard his directives. (Doc. 17).

## Clinical Competencies

The parties do not dispute that, as part of Plaintiff's performance requirements and standards, Plaintiff was required to meet annually with each of the Unit 4 staff nurses to

-3-

discuss with them their required clinical competencies, to verify that their clinical competencies had been annually assessed and reviewed, and then to sign, along with the staff nurses, their respective clinical competency evaluation forms, certifying that the clinical assessments and reviews had been completed. (Docs. 15-19, 15-20, 17).

According to Defendant, the assessment and review of the Unit 4 staff nurses' clinical competencies was a part of Plaintiff's duties, in that it was part of the quality control of the nursing care provided to the patients in Unit 4, and it helped ensure that the Unit 4 staff nurses were competent to perform their assigned nursing duties, including their competencies to dispense medication as prescribed by the physicians, to carry out physician orders regarding patient care, to administer IM injections, to properly operate the unit's equipment, to control infection, to administer CPR, to manage patient pain, to properly use restraints, to prevent patients from falling, to deal with difficult patient behavior, and to administer general geriatric and dementia patient care. (Docs. 15-19, 15-20, 15-21).

The parties do not dispute that Plaintiff's supervisors relied upon Plaintiff, as the nurse manager of Unit 4, to honestly perform all of his assigned duties,[1] including his duty to assess and review the clinical competencies of all of the Unit 4 staff nurses, and to certify on the competency evaluation form that such assessment and review had been completed.[2]

---

[1] The VAMC's Code of Conduct for its employees required that all VAMC employees, including Plaintiff, act honestly in the performance of their duties.

[2] In his Response to Defendant's Proposed Undisputed Facts, Plaintiff does not dispute that his supervisors relied on him to honestly perform his assigned duties, including assessing, reviewing and certifying the clinical competencies of his staff nurses. (Doc. 17). Instead, Plaintiff simply denies acting dishonestly. (*Id.*)

### Forgery Investigation and Demotion

On July 20, 2007, the Veterans Affairs police initiated an investigation based on a complaint filed by Rhonda Newman ("Newman"), a staff nurse in the dementia unit supervised by Plaintiff, that Plaintiff had forged her signature on a clinical competency evaluation form. (Doc. 15-5). According to the VA police report, Newman stated that:

> She went into [Plaintiff's] office and saw her paperwork on his desk.
> She did not want any one else going in and seeing her paperwork so
> she began to put the information in a folder when she saw the
> competency assessment on his desk and the signature was not hers.
> She made copies and filed a police report.

(*Id.*)

Sometime after police investigation began, Anna Jones Monnett ("Monnett"), Plaintiff's third-level supervisor, became aware of the forgery investigation. According to Monnett, shortly after becoming aware of the investigation, she confronted Plaintiff and asked him if the allegation was true. (Doc. 15-21). According to Monnett, Plaintiff emphatically denied the allegation, suggesting that the staff nurse had falsely made the allegation in retaliation for Plaintiff having recently counseled the nurse regarding a personnel matter. (*Id.*)

On August 20, 2007, Plaintiff was interviewed by the VA police. During that interview, Plaintiff denied forging Newman's signature and stated that his own signature on the document appeared to be forged. (Doc. 15-7). Further, Plaintiff informed VA police of his suspicion that Newman lodged the forgery accusation in retaliation to "pending disciplinary action against her[.]" (*Id.*)

-5-

Thereafter, on August 21, 2007, Plaintiff was interviewed for a second time by VA police regarding the forgery. (Doc. 15-8). During that interview, Plaintiff's story changed. (*Id.*) Plaintiff admitted that his signatures did, in fact, appear on the form and that his signature was not forged. (*Id.*) Plaintiff did, however, continue to deny forging Newman's signature. (*Id.*)

On August 23, 2007, the Miami Valley Regional Crime Laboratory ("Crime Lab") issued a report after conducting handwriting analysis on the clinical competency form. (Doc. 15-9). In that report, the Crime Lab's document examiner concluded that it was unlikely the signatures on the clinical competency form purporting to be that of Newman were actually Newman's signatures. (*Id.*) The report also concluded that there was "insufficient evidence to support" a conclusion that Plaintiff signed Newman's signature "due to possible disguise in the requested handwriting specimen form." (*Id.*)

After the VA police received the Crime Lab's report, Plaintiff was interviewed for a third time. (Doc. 15-10). During the third interview, Plaintiff's story changed yet again. (*Id.*) This time, after learning the results of the Crime Lab's handwriting analysis, Plaintiff was asked to tell the truth about the alleged forgery of Newman's signature. (*Id.*) Plaintiff responded:

> I don't remember to tell you the truth, it was 21 months ago and the only possible case scenario that I can even think of was we were in the middle of four (4) investigations on the unit and Central Office was here and the very best that I can remember was that they called wanting all my nurses' clinical competencies, my R.N.'s, to the best of my knowledge. The only thing I can think what happened was I pulled them all out everybody's was signed but hers, she wasn't there that day I signed it so I could send them over. That's the very best and that was 21 months ago and I can't. That's the best I can remember. (*Id.*)

The interview concluded as follows:

| | |
|---|---|
| Chief McMillian: | What I hear you saying in a round about way is that you had all those documetns, her wasn't signed and it sounds like to me you said it needed to be signed and you signed it. |
| Mr. Smith: | Probably. |
| Chief McMillian: | That's what it appears. |
| Mr. Smith: | Probably. |
| Chief McMillian: | Is probably a . . . |
| Mr. Smith: | Like I said it was 21 months ago, I can't be one hundred percent sure, that's probably what happened. |
| Chief McMillian: | Okay, I'll settle for that now.  Because like you said, you said that everybody was there but her and you needed her signature and you probably signed them.  Anything else to add to it? |
| Mr. Smith: | No, sir. |
| Chief McMillian: | I want you to understand, we're going to send this up to HR.  Okay, that's going to conclude the interview.  Any questions? |
| Mr. Smith: | No, sir. |

(*Id*).[3]  The VA police closed its investigation into the forgery on September 25, 2007, concluding "that there [was] no Criminal intent" with regard to the forgery of Newman's signatures. (Doc. 15-5).

---

[3]  Plaintiff confirmed his statements to the VA police during his deposition in this case.  (Doc. 15-18).

According to Monnett, sometime in the fall of 2007, the VA Chief of Police notified her that Plaintiff admitted to forging Newman's signature on the clinical competency evaluation form. (Doc. 15-21). Thereafter, Monnett requested, received and reviewed the VA police report and Plaintiff's statements the VA police. (*Id.*) Based on her review of those material, Monnett "believed that [Plaintiff] had in fact forged the signatures of one of his staff nurses, and then lied about it to both [her] and the VA police." (*Id.*) According to Monnett, her belief that Plaintiff forged the signature and then subsequently lied about it "caused [her] to lose confidence in [Plaintiff's] ability to honestly perform all of his duties as a nurse manager in the future." (*Id.*)

In late fall 2007, Carol Ahlers ("Ahlers"), Plaintiff's second-level supervisor, learned of the forgery investigation from Monnett. (Doc. 15-20). Upon receiving and reviewing the VA police report and copies of the statements Plaintiff made to the VA police, Ahlers "believed that [Plaintiff] had in fact forged the signatures of one of his staff nurses, and then lied about it to the VA police." (*Id.*) Based on her belief that Plaintiff forged the signature and subsequently lied about it, Ahlers lost "confidence in [Plaintiff's] ability to honestly perform all of his duties as a nurse manager in the future." (*Id.*) According to Ahlers, she and Monnett "decided that [Plaintiff] should be asked to step down as the Unit 4 (Tall Pines) nurse manager and be reassigned as a staff nurse in another unit." (*Id.*)

On December 12, 2007, Shiverdecker met with Plaintiff to review his FY07 "Fully Successful" performance plan evaluation, as well as his "Satisfactory" FY07 functional

performance evaluation. (Doc. 15-19). On that date, Shiverdecker states that she was not

aware of the forgery investigation. (*Id.*) According to Shiverdecker:

> if [she] had then known about the VA police investigation, reviewed
> the VA police report, and reviewed [Plaintiff's] statements to the VA
> police regarding the allegation that [Plaintiff] had forged Ms.
> Newman's signatures on her clinical competency evaluation form,
> [she] would have recommended that Plaintiff be removed as the Unit
> 4 (Tall Pines) nurse manager and reassigned as a staff nurse, based
> upon [her] lack of trust that [Plaintiff] could honestly perform all of
> his duties as a nurse manager in the future.

(*Id.*) Shiverdecker states she learned of the forgery investigation only a few days after

December 12, 2007. (*Id.*)

According to Shiverdecker, based on what she learned, she "believed that

[Plaintiff] had in fact forged Newman's signatures and then lied about it to the VA

police." (*Id.*) As a result of her belief that Plaintiff forged the signature and then lied

about it to police, Shiverdecker lost "confidence in [Plaintiff's] ability to honestly

perform all of his duties as a nurse manager in the future." (*Id*). Shiverdecker also

agreed that Plaintiff "should be asked to step down as the Unit 4 (Tall Pines) nurse

manager, and be reassigned as a staff nurse in another unit." (*Id.*)

Shiverdecker and Ahlers met with Plaintiff on December 17, 2007. (Docs. 15-18,

15-19, 15-20). During that meeting, Plaintiff was asked him to step down as nurse

manager of Unit 4 and to be reassigned as a staff nurse in another unit. (*Id.*)

According to Shiverdecker and Ahlers, they advised Plaintiff that the reasons for

his demotion included Shiverdecker's concern regarding the "Cultural Transformation"

program and patient privacy issues. (Docs. 15-19, 15-20). However, according to

Shiverdecker and Ahlers, they advised Plaintiff that the primary reason for demoting

Plaintiff was Plaintiff's forgery of Newman's signatures and his subsequent lies concerning the forgery. (*Id.*) A female replaced Plaintiff as nurse manager of Unit 4. (Doc. 15-18).

## II. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986).

"Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment - rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

Once "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading[.]" *Viergutz v. Lucent Technologies, Inc.*, 375 Fed. Appx. 482, 485 (6th Cir. 2010) (citing Fed. R. Civ. P. 56(e)(2)). Instead, the party opposing summary judgment "must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial." *Id.* (citing Fed. R. Civ. P. 56(e)(2)).

## III. ANALYSIS

Defendant moves for summary judgment on all claims asserted by Plaintiff, namely, Plaintiff's allegations that Defendant: (1) maintains a pattern and practice of treating male nurses differently than similarly situated female nurses; (2) treated him differently than similarly situated female nurses; and (3) wilfully, wantonly, maliciously or recklessly disregarded Plaintiff's employment rights.

### A.    **Pattern-or-Practice of Discrimination**

The Court first addresses Plaintiff's allegation that "Defendant has a pattern and practice of treating male nurses differently, to their detriment, than similarly situated female nurses." (Doc. 1).  Defendant asserts two defenses to a pattern-or-practice claim: (1) any pattern-or-practice claim is barred because Plaintiff failed to exhaust administrative remedies; and (2) any such claim is barred as unavailable to individual plaintiffs.

The Court concludes that Plaintiff is not asserting a separate claim on the basis of a pattern-or-practice of discrimination.  Instead, as evidenced by the arguments advanced by Plaintiff in his Memorandum in Opposition (Doc. 16), Plaintiff's pattern-or-practice allegation is offered in support his disparate treatment claim.  Plaintiff argues that purported "statistical anomalies" regarding the percentage of males in nurse manager positions is "probative indica that gender and not a stale signature was the actual motivating cause for demoting" Plaintiff.  (Doc. 16).

The Sixth Circuit holds that while "the pattern-or-practice method of proving discrimination is not available to individual plaintiffs[,]"[4] evidence showing a "pattern-or-practice . . . may be relevant to proving an otherwise-viable individual claim for disparate treatment under the McDonnell Douglas framework." *Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004); *see also Strader v. Am. Fed'n of State, Cnty and Mun. Employees, Local 1027*, No. 1:04cv829, 2006 WL 2373182, at \*3 n 2 (S.D. Ohio Aug. 16, 2006) (concluding that, because plaintiff brought a purported pattern-and-practice claim "as an individual, he cannot proceed on the pattern-or-practice method of proving discrimination").

Thus, while Plaintiff cannot proceed on a pattern-or-practice *claim* regardless of whether or not he exhausted administrative remedies, the Court concludes that Plaintiff is not foreclosed from offering pattern-or-practice *evidence* in support of a disparate treatment claim. *See Cosby v. Hoffman-La Roche, Inc.*, 2:10-cv-180, 2010 WL 5092779, at \*3 (S.D. Ohio Dec. 7, 2009) (concluding that, "to the extent that [plaintiff's] allegation of a pattern and practice of discrimination was intended to stand alone as a separate claim, it cannot go forward[,]" but "'pattern-or-practice evidence may be relevant to proving an otherwise-viable individual claim'").

Accordingly, Defendant's Motion is **GRANTED** only to the extent Plaintiff asserts an individual claim based on a purported pattern-or-practice of discrimination.

---

[4] In concluding that "the pattern-or-practice method of proving discrimination is not available to individual plaintiffs[,]" the Sixth Circuit "subscribe[d] to the rationale that a pattern-or-practice claim is focused on establishing a policy of discrimination; because it does not address individual hiring decisions, it is inappropriate as a vehicle for proving discrimination in an individual case." *Bacon*, 370 F.3d at 575 (citations omitted).

Nevertheless, the Court addresses Plaintiff's purported pattern evidence in analyzing

Plaintiff's disparate treatment claim.

**B.      Disparate Treatment**

Next, Defendant argues that it is entitled to summary judgment on Plaintiff's

disparate treatment claim.  In this case, the parties do not dispute an absence of direct

evidence of discrimination.  Absent direct evidence of discrimination, a claim of

discrimination under Title VII is "analyzed pursuant to *McDonnell Douglas Corp. v.

Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as modified by *Texas

Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)."

*Bartlett v. Gates*, 421 Fed. Appx. 485, 488 (6th Cir. 2010).

"To make a prima facie showing of discrimination, a plaintiff must establish that

he or she (1) 'was a member of a protected class'; (2) 'suffered an adverse employment

action'; (3) 'was qualified for the position'; and (4) 'was replaced by someone outside the

protected class or was treated differently than similarly-situated, non-protected

employees.'" *Colvin v. Veterans Admin. Med. Ctr.*, 390 Fed. Appx. 454, 457 (6th Cir.

2010).   A plaintiff making the "prima facie showing by a preponderance of the evidence

. . . is entitled to a presumption of discrimination." *Id.* (citing Burdine, 450 U.S. at 254).

Thereafter, an employer can overcome the presumption of discrimination by

articulating "'a nondiscriminatory reason for its action.'" *Bartlett*, 421 Fed. Appx. at 488

(citing *Harris v. Metro. Gov. of Nashville & Davidson Cnty., Tenn.*, 594 F.3d 476, 485

(6th Cir.2010)); *see also Colvin*, 390 Fed. Appx. at 457.  "Employers who provide a

legitimate, non-discriminatory reason for their . . . decision will be entitled to summary judgment unless plaintiffs can rebut the employer's explanation by demonstrating pretext." *Id.*

"To establish pretext, a plaintiff must show that an employer's stated reason: (1) had no basis in fact; (2) did not actually motivate the challenged conduct; or (3) was insufficient to explain the challenged conduct." *Simpson v. Vanderbilt Univ.*, 359 Fed. Appx. 562, 569-70 (6th Cir. 2009) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078 (6th Cir.1994)); *see also Bartlett*, 2010 WL 4723786, at *5. To meet this burden, a plaintiff must present "'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him.'" *Id.* (citations omitted). "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-16 (1993); *see also Simpson*, 359 Fed. Appx. at 570.

Importantly, even though "the burdens of production shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 391 (6th Cir. 2009). On a motion for summary judgment, this court "considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry.'" *Id.* at 390-91 (citing *Blair v. Henry Filters, Inc.*, 505 F.3d 517 (6th Cir.2007); *Cline v. Catholic Dioc. of Toledo*, 206 F.3d 651, 661 (6th Cir.2000)).

Here, for summary judgment purposes, Defendant does not dispute the existence of a prima facie case and Plaintiff does not dispute that Defendant meets its burden of articulating a nondiscriminatory reason for Plaintiff's demotion, *i.e.*, forgery of Newman's signature on the clinical competency evaluation form. As a result, the critical inquiry for summary judgment purposes is whether the nondiscriminatory reason proffered by Defendant is merely a pretext for unlawful discrimination.

Plaintiff seeks to show pretext by arguing that: (1) he was treated differently than similarly situated employees, (2) statistical evidence demonstrates Defendant's preference for women in nurse manager positions; (3) the purported non-discriminatory reason has no basis in fact; (4) the purported non-discriminatory reason did not actually motivate his demotion; (5) Defendant offered shifting reasons to justify Plaintiff's demotion; and (6) the purported non-discriminatory reason was not a sufficient basis to support his demotion.

### 1.    Similarly Situated Employees

Plaintiff attempts to demonstrate pretext by first arguing that another nurse manager at the VAMC, Brenda Blackshear, was treated differently despite reports of patient abuse, employees engaging in and threatening violence, a patient theft report, and the contention that Blackshear was "placed on a Performance Improvement Plan." (Doc. 16). To demonstrate such an argument, Plaintiff cites to an affidavit he apparently submitted to the EEOC. (Doc. 15-22). In that affidavit, Plaintiff asserts in a conclusory manner that Brenda Blackshear, and two other female nurse managers, were "treated

more favorably than" him "by management in regard to their performance ratings." (Doc. 15-22).

In that EEOC affidavit, Plaintiff admits that the basis of his purported knowledge that these female nurse managers were treated more favorably was solely from "word of mouth." (*Id.*) Further, contrary to the unsupported assertion now argued in his response, Plaintiff testified during his deposition in this case that, to his knowledge, Blackshear was not placed on a Performance Improvement Plan. (Doc. 18-1). Essentially, Plaintiff's reference to Blackshear as a similarly situated employee is conflicting, conclusory and unsupported by any evidence in the record.

Accordingly, the Court finds no pretext on the basis of Plaintiff's conflicting, conclusory and unsupported assertion that Blackshear was a similarly situated employee who was treated differently in any regard. Thus, Plaintiff fails to establish pretext on this basis.

### 2. Statistical Evidence of Discrimination

Next, Plaintiff argues that "statistical anomalies" concerning the lack of men in nurse manager positions or quality management positions demonstrates gender discrimination. In his memorandum in opposition, Plaintiff sets forth the conclusory assertion that "there was one male nurse manager out of eleven positions and one male out of twenty-five Quality Management positions" at the VAMC "during the time of the EEO investigation." (Doc. 16). As already noted, Plaintiff does not favor the Court with a citation to actual evidence showing the validity of this statistic.

Nevertheless, even assuming the truth of Plaintiff's statistics regarding the gender composition of particular positions at the VA Hospital, Plaintiff provides no comparative statistical evidence demonstrating "the qualified population in the relevant labor market." *Driggers v. City of Owensboro, Kentucky*, 110 Fed. Appx. 499, 509 (6th Cir. 2004) (concluding that statistical evidence showing that "females make up only 4% to 4.5% of the City of Owensboro's Police Department whereas women comprise close to one-half of this country's workforce" was "not probative of sex discrimination . . . because it fails to compare the gender composition of the police force to the qualified population in the relevant labor market") (citing *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299 (1977)); *see also Smith v. Leggett Wire Co.*, 220 F.3d 752, 761-62 (6th Cir. 2000) (concluding that "statistics relating to the percentage of minority supervisors . . were not admissible because he did not establish the number of qualified minorities available in each labor market").

Absent evidence regarding the percentage of qualified men in the relevant labor market, Plaintiff's unsupported statistical evidence is not probative of discrimination and fails to demonstrate pretext.

### 3.    Basis in Fact for Proffered Reason

Plaintiff also contends that the proffered reason has no basis in fact because he never admitted to forging the signature on the certification form. If "an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately

-17-

shown to be incorrect." *Scott v. FirstMerit Corp.*, 167 Fed. Appx. 480, 484 (6th Cir. 2006) (citing *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir.2001)).

Here, while Plaintiff arguably did not specifically admit to forging Newman's signature, the particularized facts in evidence in this case support Defendant's honest belief that Plaintiff did, in fact, forge Newman's signature. Handwriting analysis confirmed that Newman's signature was forged. (Doc. 15-9). Plaintiff's story changed during each separate police interview until Plaintiff eventually detailed how and why he "probably" forged Newman's name to clinical competency evaluation form. (Doc. 15-10). Plaintiff's assertion that he could not specifically remember forging the document is "insufficient to call into question [his employers'] honest belief that he did[,]" especially in light of the detailed reasoning why he "probably" forged Newman's signature. *See Majewski*, 274 F.3d at 1117.

Accordingly, there is a sufficient basis in fact upon which Shiverdecker, Ahlers and Monnett could reasonably hold an honest belief that Plaintiff forged Newman's signature on the clinical competency evaluation form. Thus, Plaintiff's argument in this regard fails to demonstrate pretext.

### 4. Motivation for the Demotion

Next, Plaintiff contends that the "stale" forgery did not actually motivate the demotion. In this regard, Plaintiff relies on the fact that the signature was purportedly forged almost two years before Plaintiff's demotion. The Court finds no merit to this

assertion. The mere fact that the forged "writing dates back to January 2006" is really of no consequence because no one knew of the forgery until Rhonda Newman discovered it in Plaintiff's office in mid-to-late July 2007. (Doc. 15-5). Accordingly, the Court does not find pretext simply because the forgery dated back approximately two years.

Plaintiff also points to the fact that the criminal investigation regarding the forgery ended in September 2007,[5] almost three months before his demotion, and contends that, if the forgery was truly the reason for his demotion, the forgery would have been made part of his performance evaluation conducted with Shiverdecker on December 12, 2007. The evidence before the Court does establish that Monnett learned of the forgery at some point during the VA police investigation. (Doc. 15-21).[6] However, it was not until "the fall of 2007" that Monnett was informed that Plaintiff admitted the forgery to police. (Doc. 15-21). Certainly, the VA police reports indicate that Plaintiff admitted he "probably" forged Newman's signature on September 5, 2007.

According to Monnett, only after learning of Plaintiff's apparent admission to the forgery did she request the police reports and Plaintiff's statements to police. Further, only after reviewing the police reports and statements did Monnett form the belief that Plaintiff forged the signature and lied about it to police. (*Id.*)

In "late fall" 2007, after Monnett formed her beliefs about Plaintiff's involvement in the forgery, Monnett informed Ahlers of the forgery investigation. (Doc. 15-20). Only

---

[5] The police investigation concluded on September 24, 2007. (Doc. 15-5).

[6] According to Monnett, upon learning of the investigation, he actually confronted Plaintiff regarding the allegations, which Plaintiff "emphatically denied." (Doc. 15-21).

after Ahlers learned of the alleged forgery from Monnett in late fall 2007 did she: (1) review the police reports and statements, (2) conclude that Plaintiff forged the signature and lied about it to police, and (3) "lose [her] confidence in [Plaintiff's] ability to honestly perform all of his duties as nurse manager." (Doc. 15-20).

Finally, Shiverdecker, Plaintiff's rating official and the third of Plaintiff's three supervisors, only first became aware of the forgery investigation in the days following Plaintiff's December 12, 2007 performance evaluation. (Doc. 15-19). On December 17, 2007, within days after Shiverdecker finally learned of the alleged forgery, Plaintiff was asked to resign his nurse manager position. (Doc. 15-19, 15-20).

Based on this time-line of events, at the most, only a few months elapsed between the time Monnett first learned of the forgery and formed her conclusions about Plaintiff's ability to honestly perform his job. Further, only days, at the most, elapsed between the time Shiverdecker, Plaintiff's actual rating official, learned of the forgery and the time Plaintiff was asked to resign. Accordingly, Plaintiff's "staleness" argument does not demonstrate pretext.

### 5.    Shifting Reasons for Demotion

Next, Plaintiff essentially argues that Defendant gave shifting reasons for the demotion. According to Plaintiff, during the December 17, 2007 meeting when he was demoted, Ahlers and Shiverdecker justified the requested demotion by first stating that Plaintiff was not being supportive of the cultural transformation or restorative care. (Doc. 15-18). In his Memorandum in Opposition, Plaintiff argues that, only "when [he] began

-20-

to systematically address and refute the proffered reasons for his demotion . . . did [Ahlers and Shiverdecker panic and] default to the purported forgery." (Doc. 16).

Plaintiff's deposition testimony does not offer such a dramatic tale of Shiverdecker and Ahlers panicking and defaulting to the forgery as the reason for the demotion. (Doc. 15-18). Plaintiff testified:

> [The forgery] was brought up when they asked me to resign my position only after when she said it was due to not being supportive of the cultural transformation and I described all of that to them, how I was supportive and then they went to restorative care. I went through all of that and then finally they said well, you forged the document and that's the first time I ever heard a word from anyone regarding that document.

(Doc. 15-18). Shiverdecker and Ahlers admit that "concerns regarding the 'Cultural Transformation' program and patient privacy issues" were reasons for Plaintiff's demotion, but declare that "the primary reason [for requesting the demotion] was [Plaintiff's] forgery of Ms. Newman's signatures, and then lying about it." (Docs. 15-19, 15-20).

Plaintiff's contention that shifting reasons were offered to support his demotion, at the most, creates a very weak issue of fact regarding the truthfulness of Defendant's purported reason for demoting Plaintiff. *See Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 504 (6th Cir. 2007) (stating that "summary judgment is appropriate . . . if the plaintiff 'only created a weak issue of fact as to whether the defendant's reason was untrue' and there is ample evidence to support the employer's position") (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000)); *see also Chen v.*

*Dow Chemical Co.*, 580 F.3d 394 (6th Cir. 2009) (stating that "summary judgment [in favor of the employer] is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation").

Even if a reasonable juror could conclude that the alleged forgery was not Defendant's actual basis for demoting Plaintiff, which is simply not the case here based on the evidence presented to the Court, there is no evidence supporting a conclusion that gender discrimination was the true reason.[7]

### 6. Forgery Insufficient to Reason to Support Demotion

Finally, Plaintiff appears to argue that the document he allegedly forged was not an important document, and therefore, the forgery of a signature on that document was insufficient grounds to warrant a demotion. Plaintiff refers to the signatures on the document as "signatures of convenience," without any real elaboration or evidentiary support. Further, Plaintiff appears to argue "there was no probative prejudice arising from the signature" to Rhonda Newman because the forged signature benefitted Newman by certifying her clinical competence.[8] (Doc. 16).

---

[7] During his deposition, Plaintiff testified regarding two instances where Plaintiff purportedly believed he was subjected to anti-male statements. In the first instance, Plaintiff testified that, before meeting with an investigative team in 2006, Ahlers told Plaintiff "not to use [his] good ol' boy attitude." (Doc. 15-18). The second instance occurred at a ribbon cutting ceremony of the remodeled Unit 4 when Monnett allegedly introduced Plaintiff by stating that he was "appropriately standing by the pool table," a comment Plaintiff allegedly understood to mean that all he did was "shoot pool down there all day." (Doc. 15-18). Interestingly, Plaintiff makes no mention of either instance in his Memorandum in Opposition to Defendant's Motion for Summary Judgment. (Doc. 16). Nevertheless, the Court concludes that the alleged statements, even if an anti-male animus can be derived from them, are isolated, ambiguous comments insufficient to support any claim of discriminatory animus on the basis of gender.

[8] Plaintiff does not explicitly state how Newman "ultimately benefitted" from the forgery, and the Court can only surmise that the purported benefit to Newman was a certification of clinical competency without having undergone a formal competency assessment.

Contrary to Plaintiff's conclusory assertion regarding the lack of importance of the forged document, Defendants offer evidence that the completion of clinical competencies, which was part of Plaintiff's duties as nurse manager, "was part of the quality control of the nursing care provided to the patients in Unit 4 (Tall Pines)." (Docs. 15-19, 15-20, 15-21). Indeed, completion of clinical competencies:

> helped ensure that the Unit 4 staff (Tall Pines) nurses were competent to perform their assigned nursing duties, including their competencies to dispense medication as prescribed by the physicians, to carry out physician orders regarding patient care, to administer IM injections, to properly operate the unit's equipment, to control infection, to administer CPR, to manage patient pain, to properly use restraints, to prevent patients from falling, to deal with difficult patient behavior, and to administer general geriatric and dementia patient care.

(*Id.*) Plaintiff points to no evidence to rebut Defendants' declarations.

Instead, Plaintiff takes the rather simplistic view of the forgery, arguing that because Rhonda Newman "ultimately benefitted" from her forged signature, the forgery "had no prejudicial, material or operational effect or import." (Doc. 16). Based on the many important aspects of assessing continuing clinical competency of staff nurses outlined in the declarations of Shiverdecker, Ahlers and Monnett, Plaintiff's simplistic view of prejudice and narrow focus on Newman's interest is misguided. Certainly the VAMC and its patients possess an interest in the continuing assessment of staff nurses' clinical competency, and forging a signature in lieu of a formal clinical competency assessment could certainly prejudice the VAMC and its patients.

Having offered no evidence that forging a clinical competency evaluation form was an offense insufficient to support demotion, Plaintiff's arguments in this regard fail to demonstrate pretext.

### 7.    Conclusion – Plaintiff Fails to Demonstrate Pretext

For all of the foregoing reasons, no reasonable juror could conclude that Defendant's proffered reason for demoting Plaintiff was merely a pretext for discrimination.  Accordingly, Defendant's Motion with regard to Plaintiff's disparate treatment claim is **GRANTED**.

### C.  Reckless Disregard for Employment Rights and Punitive Damages

Finally, Defendant moves for summary judgment on Plaintiff's claim that Defendant acted willfully, wantonly, and in a malicious manner with a reckless disregard for Plaintiff's employment rights.  Defendant contends that this claim is barred because Plaintiff failed to include the claim in his EEOC complaint, and therefore, failed to exhaust administrative remedies.  Defendant also contends that such allegations are advanced in support of Plaintiff's prayer for punitive damages, which Defendant argues are not recoverable against federal agencies.  Plaintiff submits no opposition to Defendant's Motion in this regard.

Specifically, 42 U.S.C. § 1981a(b)(1), which is titled "[d]amages in cases of intentional discrimination in employment[,]" provides that:

> A complaining party may recover punitive damages under this
> section against a respondent (<u>other than a government, government
> agency</u> or political subdivision) if the complaining party
> demonstrates that the respondent engaged in a discriminatory
> practice or discriminatory practices with malice or with reckless
> indifference to the federally protected rights of an aggrieved
> individual. (Emphasis supplied).

Here, the Court agrees that Plaintiff's allegations of wilful, wanton and malicious acts

with reckless disregard for Plaintiff's rights are asserted in support of Plaintiff's prayer

for punitive damages. Pursuant to § 1981a(b)(1), Plaintiff cannot recover punitive

damages because Defendant is a government agency. *See Burns v. Principi*, No. 3:04-

410, 2005 WL 1638733, at *3 (M.D. Tenn. Jul. 6, 2005).

Accordingly, Defendant's Motion for Summary Judgment with regard to punitive

damages is **GRANTED**.

## IV. CONCLUSION

For the forgoing reasons, there being no genuine issue as to any material fact, and

Defendant being entitled to judgment as a matter of law, Defendant's Motion for

Summary Judgment (Doc. 15) is **GRANTED** in its entirety.

**IT IS SO ORDERED.**

Date: _9/6/11_                           _Timothy S. Black_
                                         Timothy S. Black
                                         United States District Judge

-25-